IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,051

In the Matter of the Adoption of
BABY GIRL G.

SYLLABUS BY THE COURT

1.

As a general rule, issues addressed in a petition for review must have been preserved in the Court of Appeals, if not decided there. Issues not presented to the Court of Appeals may not be raised on a petition for review unless the party seeking review demonstrates exceptional circumstances.

2.

This court recognizes three exceptions to the preservation requirement: (1) the newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason.

3.

Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 22, 2019. Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed July 10, 2020.

1

Judgment of the Court of Appeals is affirmed. Judgment of the district court is affirmed, and the case is remanded with directions.

*Margie J. Phelps*, of Topeka, and *Jordan E. Kieffer,* of Dugan & Giroux Law, Inc., of Wichita, were on the briefs for appellant natural father.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, was on the brief for appellees adoptive parents.

The opinion of the court was delivered by

ROSEN, J.: This is an appeal from the termination of a biological father's parental rights consequent to an adoption. The Court of Appeals affirmed the termination, and this court granted review, including review of an issue not raised in the courts below.

Baby Girl G. was born on September 19, 2018. On September 20, 2018, the natural mother signed off on a consent to adoption and relinquishment of parental rights. In the consent form, she averred that the appellant and another man were possible biological fathers.

On September 21, 2018, the petitioners (the adoptive parents) filed a petition in district court seeking to terminate the natural mother's maternal rights in G. and to adopt the girl. On the same day, the adoptive parents filed a separate petition seeking to terminate the parental rights of the two identified possible fathers.

Later that day, the district court entered an order granting the petitioners temporary custody of G. On October 11, 2018, the appellant filed a voluntary acknowledgment of paternity. In an accompanying letter, he stated his intent to contest the adoption, maintaining that he had a life-long interest in being a father and had

provided the mother with financial and emotional support during the pregnancy until she severed contact with him.

An evidentiary hearing was conducted at the beginning of March 2019 pursuant to K.S.A. 2019 Supp. 59-2136. The biological mother and father testified at the hearing, along with other witnesses for both parties. At the conclusion of the hearing, the court announced that it found that the father had failed to provide meaningful support to the mother during the final six months of her pregnancy. See K.S.A. 2019 Supp. 59-2136(h)(1)(D). Additionally, the court stated that it had received sufficient evidence to find the father unfit, based on his drug use, psychological disorders, and refusal to participate in counseling. K.S.A. 2019 Supp. 59-2136(h)(1)(B). But, the court declined to base termination on that ground so as to protect the father's future prospects. On March 20, 2019, the court entered judgment terminating the father's parental rights.

The father filed a timely notice of appeal to the Kansas Court of Appeals, and the district court appointed counsel to represent him on appeal. The district court subsequently consolidated the two petitions for purposes of appeal.

The Court of Appeals affirmed the order of termination but reversed the award of attorney fees and remanded that issue to the district court for reconsideration. *In re Adoption of Baby Girl G.*, No. 121,051, 2019 WL 6223121 (Kan. App. 2019) (unpublished opinion). The father filed a petition for review, in which he challenged the factual basis for the termination order and raised for the first time an attack on the constitutionality of K.S.A. 2019 Supp. 59-2136(h)(1)(D) on which the termination was based. This court granted review without limitation or reservation.

3

*Analysis*

K.S.A. 2019 Supp. 59-2136(h)(1) governs termination of a father's rights in the course of an adoption proceeding. Subsection (h)(1)(B) allows a court to terminate paternal rights if "the father is unfit as a parent." Subsection (h)(1)(D) allows termination if "the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." The district court considered arguments based on both sections but elected to rely only on the latter, holding that the father failed to provide the mother with adequate support during this period of her pregnancy. Before this court, he argues both that subsection (h)(1)(D) is unconstitutional and that the district court's finding of inadequate support was not grounded in substantial and competent evidence.

In the district court, the father introduced evidence and sought to prove that he had made such substantial contributions to the mother's support and well-being that he had not forfeited his claims to paternal rights over G. The district court ruled to the contrary, and the father appealed from that ruling to the Court of Appeals, where he advanced the same arguments, urging that court to hold the district court made incorrect factual findings that led to incorrect legal conclusions. The Court of Appeals disagreed, whereupon the father filed a petition for review advancing a constitutional theory that was novel for this case, in that it had not been raised before either lower court, and novel for this area of law, in that it has not been successfully argued in this court or, for the most part, in any other United States jurisdiction.

*Preservation*

For reasons we set out below, we decline to address the constitutional issue because it was raised in neither the district court nor the Court of Appeals.

4

On December 9, 2019, after the Court of Appeals issued its opinion in this case, the father retained new counsel. This new counsel filed a petition for review on his behalf on December 23, 2019. The petition raised an entirely new theory for why the father should prevail: that the statute on which the district court and the Court of Appeals relied for terminating his paternal rights is unconstitutional. This argument was never presented to a court, neither in transcribed oral arguments nor in written pleadings, until the petition for review.

To be sure, the father's brief to the Court of Appeals pointed out that the right to parent one's child is a protected constitutional right. But, the brief acknowledged that the right to raise a child is tempered by the extent to which the parent has assumed parental responsibilities. The remainder of the brief argued that the father had provided sufficient support to satisfy the Kansas statutory scheme; it did not argue that the statutory scheme is unconstitutional.

The petition for review conceded that the constitutionality of K.S.A. 2019 Supp. 59-2136(h) had not been submitted previously for determination. The father asserted that this court should nevertheless consider his argument under exceptions to the requirements of preservation. We conclude, however, that addressing this issue on the merits would be contrary to Supreme Court rules and policies.

"As a general rule, matters not raised before the district court cannot be raised for the first time on appeal." *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). In this case, not only did the father not present the issue to the Court of Appeals, he expressly conceded that his rights as a father were subject to limitation by the degree of support he provided to the mother, a position contrary to one he adopted in his petition for review.

5

In the present case, the constitutional issue was raised in neither the district court nor the Court of Appeals. An argument that was raised in neither the district court nor the Court of Appeals and is raised for the first time before the Supreme Court "fails on more than one level." *State v. Dooley*, 308 Kan. 641, 651, 423 P.3d 469 (2018). In such cases, including the present one, the party has already had two opportunities to raise an issue and failed to do so. The only apparent impediment was the choice of attorneys and their respective election of litigation and appellate strategies; the statute did not become more or less constitutional during the course of the litigation and appeal.

The lack of preservation presents a yet greater obstacle in this case because of the haphazard manner in which the issues have been proffered to this court. In his petition for review, the father set out essentially three grounds for the unconstitutionality of K.S.A. 2019 Supp. 59-2136. First, the simple fact of biological fatherhood creates a protected, substantive liberty interest in participating in the upbringing of a child, independent of the relationship between the father and the mother after conception. Second, fathers in chapter 38 child in need of care proceedings are afforded greater protection than fathers in adoption proceedings, in violation of constitutional equal protection rights. Third, depriving him of greater access to the child after the child's birth deprived him of substantive due process rights in acting as the child's father.

In his supplemental brief to this court, however, the biological father undermined the first argument by conceding that he had a duty to help the mother. He argued instead that K.S.A. 2019 Supp. 59-2136(h) is unconstitutionally vague and overbroad because it fails to set out the kind of support required of him and because it allows termination of his paternal rights without providing him the opportunity to connect with his daughter after her birth. It is unclear whether he hoped that this court would follow the signposts he set out in his petition for review or whether it would consider the newly framed arguments presented for the first time in his supplemental brief to this court. This

6

haphazard and superficially argued group of issues and sub-issues highlights the importance of raising, defining, and advocating positions in the courts below.

Kansas Supreme Court rules insert the preservation rule into briefing requirements. Supreme Court Rule 6.02(a)(5) governs the contents of appellants' briefs:

> "An appellant's brief must contain the following:
>
> . . . .
>
> "(5) The arguments and authorities relied on, separated by issue if there is more than one. Each issue must begin with citation to the appropriate standard of appellate review *and a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on.* If the issue was not raised below, there must be an explanation why the issue is properly before the court. (Emphasis added.)" (2020 Kan. S. Ct. R. 35).

This court has continued to reiterate that Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). That peril includes a ruling that an issue improperly briefed will be deemed waived or abandoned. 298 Kan. at 1085. The direction of this court is clear: "[L]itigants have no excuse for noncompliance with Rule 6.02(a)(5)." *Godfrey*, 301 Kan. at 1044.

Rule 8.03 (2020 Kan. S. Ct. R. 52) governs review of Court of Appeals decisions. Subsection (b)(6)(C)(i) states:

> "*The Supreme Court will not consider issues not raised before the Court of Appeals* or issues not presented or fairly included in the petition for review, cross-petition, or conditional cross-petition. The court, however, may address a plain error not presented. (Emphasis added.)" (2020 Kan. S. Ct. R. 54).

These rules are not merely technical hurdles that courts place in front of parties seeking appellate review. In *State v. Messner*, 55 Kan. App. 2d 630, 641, 419 P.3d 642 (2018), our Court of Appeals discussed these rules requiring preservation of issues below and explained:

> "This rule is not simply a 'gotcha' from the appellate courts. The rule encourages litigants to fully present their cases to the trial court. All issues and claims are then tested by the adversarial process further refining and defining the facts and law in dispute. How can the district judge be expected to make a decision in consideration of arguments that are not brought before him or her? The rule also insures fundamental fairness in the proceeding. Parties deserve the opportunity to respond to all arguments made and present evidence to support their respective positions. If litigants can raise a matter for the first time on appeal, they would be free to, in essence, readjudicate the matter merely because they forgot to raise everything they wanted to before the trial court or second-guessed their tactical decisions at trial once they started preparing their appellate brief. Just as we do not expect trial courts to support trial by ambush, neither should we tolerate the same on appeal. An appellant is not 'permitted to feed one can of worms to the trial judge and another to the appellate court.' *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010)."

The present case represents an extreme example of presenting "one can of worms" to a district court and another to an appellate court. The father made his factual arguments in both the district court and an appellate court, and only after losing in both venues did he elect to try a different bait in a third court. Even there, he could not quite make up his mind precisely which lure he should use.

The appellant's briefs do not attempt to explain why the issue was not presented to the Court of Appeals. At most, the petition for review stated superficial grounds for accepting review but did not explicitly apply exceptions to the preservation rule to the procedural facts of this case.

8

Rule 8.03(g)(1) states that a party may petition as a matter of right from a final decision of the Court of Appeals "in a case in which a question under the Constitution of either the United States or the State of Kansas arises for the first time as a result of the Court of Appeals decision." (2020 Kan. S. Ct. R. 57). Although the father designated his petition for review as being filed "as a matter of right," his briefing before this court did not attempt to explain how the constitutional issues he asserted met the Rule 8.03(g) requirement that they arose "for the first time as a result of the Court of Appeals decision." The Court of Appeals decision here simply affirmed the judgment of the district court. The father's constitutional argument did not arise "for the first time as a result of the Court of Appeals decision."

There are, however, three recognized exceptions to the preservation requirement:

> "(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason." *State v. Gomez*, 290 Kan. 858, Syl. ¶ 2, 235 P.3d 1203 (2010).

See also *State v. Jones*, 302 Kan. 111, 117, 351 P.3d 1228 (2015).

The first and third exceptions do not apply to the present case. The first exception offers no avenue to review because the father's constitutional claims are not purely questions of law determinative of the case. If this court were to agree with him, the case would have to be remanded for further factual findings regarding his fitness as a parent and possibly for other findings, the nature of which is unclear from his briefing. There is also no indication that the district court was right for the wrong reason. It made no determinations at all about the constitutionality of the statute, and a holding by this court that the statute is

9

unconstitutional would suggest that the district court was wrong to apply the statute even though the validity of the statute was not contested before it.

Under the second exception, this court might consider the father's constitutional arguments to serve the ends of justice or to prevent the denial of his fundamental rights. We note that, even when an exception would support a decision to review a new claim, the appellate courts have no obligation to do so. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165, 170 (2020).

Both this court and the United States Supreme Court have rejected the claim that biological paternity in itself creates a constitutional right to participate in the care and upbringing of a child. See, e.g., *Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983) ("the mere existence of a biological link does not merit equivalent constitutional protection"); *Caban v. Mohammed*, 441 U.S. 380, 392, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979) (if father had not "come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclude[] the State from withholding from him the privilege of vetoing the adoption of that child"); *In re Adoption of A.A.T.*, 287 Kan. 590, 601, 196 P.3d 1180 (2008) ("a biological relationship does not guarantee the permanency of the parental rights of an unwed natural father"); *In re K.M.H.*, 285 Kan. 53, 169 P.3d 1025 (2007) (in context of artificial insemination, biological paternity in itself establishes no right to participate in parenting decisions under constitutional equal protection or due process considerations).

Although this court may revisit this issue at some future time when it is fully briefed and argued before reaching us, we are not prepared to hold at this time that following the precedent both of this court and of the highest court in our country constitutes manifest injustice or a denial of the father's fundamental rights.

10

Finding the issue inadequately preserved for our consideration, we therefore decline to analyze or rule on the constitutionality of K.S.A. 2019 Supp. 59-2136.

*Merits*

The father also challenges the primary issue with which the district court and the Court of Appeals were concerned: whether he supported the mother during the last six months of her pregnancy without reasonable cause excusing the lack of support. See K.S.A. 2019 Supp. 59-2136(h)(1)(D). The district court found that he failed to provide such support, and the Court of Appeals upheld that finding.

Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e.*,* supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010).

The district court stated an extensive review of the evidence before it, summarizing:

> "It has been established by clear and convincing evidence that [the father], having—after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth. What little support that was given—and it's so little it's almost not worth mentioning, but there was something given. So what little support there was given, both financial and emotional, were not significant or sustained, and were incidental within the meaning of the statute."

11

These findings were supported by the testimony and documentary evidence presented to the court. Viewing this evidence in the light most favorable to the prevailing party, the district judge's fact-findings appear highly probable and supported by clear and convincing evidence. See *B.B.M.*, 290 Kan. at 244 (setting out standard of review and basis for affirming termination decisions).

The father does not explain in what way the district court made incorrect findings or findings not based on competent evidence. He, instead, argues that the district court could have made different findings based on the evidence, but that is not an indication of reversible error.

The Court of Appeals reviewed the record in detail and concluded that the evidence supported the district court's findings. First, the father's non-financial support, in the form of giving her occasional rides, accompanying her to some classes and medical appointments, and encouraging text messages, were inconsistent and of dubious value, given her needs. *Baby Girl G.*, 2019 WL 6223121, at *6, 7. Second, the court noted that his financial support between March and September "was inconsequential, amounting to less than $200. While Father relies heavily on his text messages to bolster his argument, his texts were at best insignificant support, and at worst, actively harmful to Mother. The record does not show Father had reasonable cause justifying his failure to support Mother." *Baby Girl G.*, 2019 WL 6223121, at *8.

The father does not explain why the Court of Appeals erred in its review of the district court findings. He complains that not enough weight was given to his positive actions, but he does not explain how the assignment of weight to the evidence constituted reversible error. He also complains that undue weight was placed on the mother's subjective experience of the support that was provided or offered, but the record does not

12

show that the district court relied on her subjective responses. It mentioned her reactions, as did the Court of Appeals, but it did not base its legal conclusions on her reactions.

The parties did not seek review of the attorney fees issue. Finding no error, we affirm the opinion of the Court of Appeals in its entirety. The case is accordingly remanded to the district court for reconsideration of the question of attorney fees consistent with the directions provided by the Court of Appeals.

MICHAEL E. WARD, Senior Judge, assigned.[1]

\* \* \*

STEGALL, J., dissenting:  I dissent from the majority's decision declining to consider Father's constitutional challenge to K.S.A. 2019 Supp. 59-2136. Instead, I would exercise our prudential discretion to consider this important issue despite the fact that it was not preserved below. The majority suggests its hands are tied by characterizing the option of considering this issue for the first time on appeal as "contrary to Supreme Court rules and policies." Slip op. at 5. This overstates the matter considerably.

In fact, we regularly exercise our discretion to take up unpreserved, yet important matters when it is necessary to serve the ends of justice. Indeed, we have gone so far as to raise issues sua sponte when we determine the resolution of the case demands it. See *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017) ("[B]ecause preservation is a

---

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 121,051 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

prudential rule, rather than a jurisdictional bar, we have also held that an appellate court has discretion to apply exceptions to that general rule . . . includ[ing] the sua sponte reaching of an issue not raised below or on appeal by either party."); *State v. Sedillos*, 279 Kan. 777, 785, 112 P.3d 854 (2005) ("'When it is necessary in order to determine the merits of the action or where the issues cannot be intelligently decided without doing so, the constitutionality of a statute should be decided, even if the parties failed to raise the constitutional question, failed to plead the question, or failed to present the question to the trial court.'").

Moreover, the majority properly recites our long-standing exceptions to our preservation rule, one of which is clearly met here—an issue involving "only a question of law arising on proved or admitted facts and is determinative of the case." Slip op. at 9. So I would exercise our prudential option to consider Father's constitutional challenge (even though it was not raised in the Court of Appeals) because the issue strikes at the heart of one of the most cherished rights protected by the Constitution—a parent's fundamental right to his or her parental relationship with the child. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (recognizing the liberty interest of parents in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court"); *In re A.A.-F.*, 310 Kan. 125, 145-46, 444 P.3d 938 (2019) (recognizing a parent's fundamental liberty interest in the right to make decisions regarding the care, custody, and control of his or her children). And the case raises the further question of whether Kansas has created, by law, different classes of parents—some of whom receive lower constitutional protections than others—in violation of equal protection guarantees. These issues are too important to go unaddressed by this court.

14

Kansas law permits an unwed biological father's parental rights to be terminated if a court finds he failed "without reasonable cause to provide support for the mother during the six months prior to the child's birth." K.S.A. 2019 Supp. 59-2136(h)(1)(D). This burden on the parental rights of unwed biological fathers is not visited on any other class of parent recognized under either Kansas statute or by the expanding universe of caselaw developed by this court.

Here, Father's fundamental parental rights to his child were terminated only because the district court found he had failed in his duty to provide support to Mother under K.S.A. 2019 Supp. 59-2136(h)(1)(D). As the Court of Appeals decision affirming the lower court wrote:

> "Father . . . [argues] that his rights should not be terminated because he acted in a way that showed he intended to assert his parental rights. The evidence does show Father planned to parent Baby Girl G. and did things to prepare for fatherhood. But under Kansas law, an unwed father has a specific duty to affirmatively provide support, particularly financial support, to the mother during the last six months of the pregnancy to ensure his parental rights. Father's financial support between March and September was inconsequential, amounting to less than $200. . . . The result may seem harsh, as Father intended to parent Baby Girl G. and provided some support. But based on the evidence, Father failed to perform his legal duty of support, and the district court did not err in finding so." *In re of Adoption of Baby Girl G.*, No. 121,051, 2019 WL 6223121, at *8 (Kan. App. 2019) (unpublished opinion).

In his petition for review, Father essentially claims that Kansas law—specifically K.S.A. 2019 Supp. 59-2136(h)(1)(D)—impermissibly dilutes his constitutionally protected and fundamental right to a parental relationship with his biological child. He also claims that this violates the equal protection guarantees of the Constitution because it "give[s] the [unwed] biological father less rights" than other classes of parents now recognized under Kansas law.

15

It is undoubtedly the case that this "biology plus a familial relationship with Mother" standard for unwed Fathers has a pedigree at the highest levels of constitutional law. Between 1972 and 1989 the United States Supreme Court decided a flurry of unwed biological father cases. *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989); *Lehr v. Robertson*, 463 U.S. 248, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983); *Caban v. Mohammed*, 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979); *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978); *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). And for over 30 years now, the Court has remained silent on this topic. See Higdon, *Constitutional Parenthood*, 103 Iowa L. Rev. 1483, 1502 (2018) ("*Michael H.* not only marked the final case in the fathers' rights cases, it also marked the last time the Court would weigh in on who qualifies as a parent under the Fourteenth Amendment.").

Collectively, these cases effectively approved the "biology-plus-family" standard. These cases are widely understood to be grounded on centuries-old "European-American traditions [that] recognized motherhood as a natural fact." Dolgin, *Just A Gene: Judicial Assumptions About Parenthood*, 40 UCLA L. Rev. 637, 644 (1993). Because the "evidence of pregnancy and childbirth was irrefutable . . . biology has been central to the identification of maternity. Nature identifies mothers. In contrast, fatherhood is 'constructed as a (conventional) object of knowledge' and fatherhood can only be presumed through a man's relation to the child's mother." 40 UCLA L. Rev. at 644 (quoting Marilyn Strathern, *Reproducing the Future: Essays on Anthropology, Kinship and the New Reproductive Technologies* 149 [1992]).

Thus, these five cases considered as a whole are generally taken to refuse "constitutional protection to unwed fathers on the basis of biological paternity alone" and opt instead to ground paternity on biology plus behavioral demands geared toward

16

creating a "family unit" or quasi-family unit. 40 UCLA L. Rev. at 654. And this "behavior" is always "conditioned by the father's relationship with the children's mother." 40 UCLA L. Rev. at 655. The standard indisputably creates a clear disparity between biological mothers and fathers. "An unwed biological father may establish a relationship with his biological child and with that child's mother through appropriate behavior and become a legal father." 40 UCLA L. Rev. at 661. Unwed mothers, however, "do not have the same choices. The Supreme Court implied that for mothers, parental rights *do* spring from a biological . . . connection between parent and child. Biology gives men the *chance* to become fathers. However, it inexorably makes women mothers." 40 UCLA L. Rev. at 661.

The whole jurisprudence of the Court's 1970s and 80s-era unwed father cases is nicely summarized by Professor Dolgin:

> "The assumption that biology does not compel social paternity, as it compels social maternity, undergirds the demand that fathers seek other paths for securing legal rights to their biological children. By forming 'families' with the mothers of their children, fathers share in the natural bonds that connect mothers and children. A man's ties to his biological child are thereby socialized. His fatherhood is understood to be constructed socially. Through the mediation of woman ('mother'), the father chooses to proclaim (and thus to claim) his 'natural' relationship to his biological child, gaining the status, and therefore the constitutional protection, that for women is viewed to stem directly from the biological connection and has not been viewed as a matter of choice." 40 UCLA L. Rev. at 663.

As another commentator has put it, the United States Supreme Court's "commitment to shedding the gendered trapping of tradition has wavered at times as its opinions have embraced gender roles to sanction differences in the unequal burdens placed on the assumption of parental rights by men and women." Dow, *ICWA and the Unwed Father: A Constitutional Corrective*, 167 U. Pa. L. Rev. 1513, 1542 (2019).

This embrace of gender roles is the animating spirit of Kansas law concerning unwed biological fathers. And while not recognizing this deeper history, Father does admit that the Court of Appeals has essentially approved and adopted the biology-plus-family standard. In *In re Baby Boy N.*, 19 Kan. App. 2d. 574, 578-586, 874 P.2d 680 (1994), the Court of Appeals held that the statutory duty of support does not impermissibly encroach on an unwed biological father's fundamental right to a parental relationship with his child. The court reasoned:

> "There is every reason for protecting the rights of a father to children, illegitimate or not, whom he has reared, loved, and supported. This is the true parental right which we protect, and it involves not only the individual rights of the father but the broader concept of family, which is also entitled to protection. By the same token, where the father's 'right' is purely biological and there has been no family formed, no bonding, no support, and no love, that right seems to be obviously less deserving of support. Those instances specified under K.S.A. 38-113a and K.S.A. 1993 Supp. 59-2136(h)(1)-(7) in which consent may be declared unnecessary are examples of situations in which the right of a natural father is little more than biological. We hold that the Constitution does not prohibit dispensing with a father's consent when the factual situations shown in 59-2136(h)(1)-(7) are shown to exist and the father's due process rights to litigate those issues has also been protected." 19 Kan. App. 2d. at 583-84.

This court, however, has never squarely addressed the argument, and it is at least plausible that the *Baby Boy N.* panel mistakenly devalued the biological element of parenthood. See, e.g., *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents.").

18

More concerning to me, however, is the potential equal protection impact of K.S.A. 2019 Supp. 59-2136(h)(1)(D) when this statute is considered in light of developing federal and Kansas caselaw. Consider, for example, the recent decision of the United States Supreme Court in *Sessions v. Morales-Santana*, 582 U.S. __, 137 S. Ct. 1678, 198 L. Ed. 2d 150 (2017). There, in a near unanimous opinion authored by Justice Ruth Bader Ginsburg, the Court considered the Immigration and Nationality Act's framework for legally determining when a child born abroad will inherit citizenship if one of the parents is a citizen. The Act imposed dramatically different parental residency requirements depending on whether the U.S. citizen was the mother or the father. The Court concluded that such disparate treatment of mothers and fathers could not withstand an equal protection challenge. 137 S. Ct. at 1686 ("The gender line Congress drew is incompatible with the [Fifth Amendment's] requirement that the Government accord to all persons 'the equal protection of the laws.'").

The Court reasoned that at the time Congress passed the Immigration and Nationality Act, there existed

> "two once habitual, but now untenable, assumptions . . . [which] underpinned judicial and administrative rulings: In marriage, husband is dominant, wife subordinate; unwed mother is the natural and sole guardian of a nonmarital child.
>
> . . . .
>
> "In the 1940 Act, Congress . . . codified the mother-as-sole-guardian perception regarding unmarried parents. . . .
>
> ". . . [A]ccording to the familiar stereotype, [unwed citizen fathers] would care little about, and have scant contact with, their nonmarital children. For unwed citizen mothers, however, there was no need for a prolonged residency prophylactic: The alien father, who might transmit foreign ways, was presumptively out of the picture." 137 S. Ct. at 1690-92.

Rejecting these assumptions, the Court concluded that because for "close to a half century, . . . this Court has viewed with suspicion laws that rely on 'overbroad generalizations about the different talents, capacities, or preferences of males and females'" the view embedded in the Act that "'unwed fathers [are] invariably less qualified and entitled than mothers' to take responsibility for nonmarital children" was "obsolescing" and "stunningly anachronistic" and could not survive an application of 21st Century equal protection jurisprudence. 137 S. Ct. at 1692-93. Finally, the Court noted that "such laws may disserve men who exercise responsibility for raising their children." 137 S. Ct. at 1693.

This is precisely the claim made by Father here. He asserts that he is fully prepared to exercise his rights and responsibilities to raise Baby Girl G. Indeed, the Court of Appeals agreed. It was only his statutory extra-parental duty to establish a relationship of support with the mother that went unsatisfied. This duty clearly flows from a world of assumptions about gender roles the United States Supreme Court has called obsolescing and stunningly anachronistic. And it is indisputable that this duty falls unequally on unwed biological fathers and not on any other class of parent now recognized under Kansas law. In my view, whether this discriminatory rule can survive the heightened scrutiny demanded by equal protection jurisprudence is something this court has a duty to consider.

Likewise, in recent years, this court has engaged in an aggressive expansion of the rights of certain classes of parents or potential parents. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, Syl. ¶ 8, 613-14, 440 P.3d 461 (2019) (finding a fundamental and natural right to terminate a pregnancy); *Frazier v. Goudschaal,* 296 Kan. 730, Syl. ¶¶ 12-13, 295 P.3d 542 (2013) (expanding the rights of non-biological persons to claim parentage by contract); see also *In re Adoption of T.M.M.H.*, 307 Kan. 902, 416 P.3d 999

(2018) (extensively discussing *Frazier*). Traditional definitions and assumptions undergirding legal definitions of "family" have also undergone a radical change since the Court decided the unwed biological father cases roughly four decades ago. See *Obergefell v. Hodges*, 576 U.S. __, 135 S. Ct. 2584, 2597-2605, 192 L. Ed. 2d 609 (2015).

Central to all these cases has been an equal protection impulse to read and apply our laws in a fundamentally gender-neutral way. See *Frazier*, 296 Kan. at 755 ("the [Uniform Parentage Act] and, in turn, the [Kansas Parentage Act] are gender-neutral, so as to permit both parents to be of the same sex"); see also *Frazier*, 296 Kan. at 757 (Biles, J., concurring in part) ("this gender-neutral reading is consistent with what this court has found to be one purpose of the [Kansas Parentage Act], which is to provide for equal and beneficial treatment of all children, regardless of their parent's marital status"). Why do we permit the gendered standard contained in K.S.A. 2019 Supp. 59-2136? Perhaps we should. Perhaps these kinds of cases suggest that the policy goals behind gendered rules governing parentage and family formation are not so prejudicial and benighted as many have assumed. But given this history (which I have only sketched in broad terms) the outcome is far from clear and the importance of the issue strikes me as obvious and compelling.

Consider that by applying the *Frazier* standard of gender-neutral statutory construction a district court could terminate a biological mother's parental rights because she did not support the father during the pregnancy. Absurd, or just and equal? Regardless of which answer one is drawn to, the question itself demonstrates that the equal protection implications raised by Father's petition for review are sufficiently important to warrant this court hearing the case.

In summary, given the burgeoning and still developing caselaw nationally and in Kansas on parentage and family formation, it is wrong, in my judgment, to leave unwed biological fathers languishing in the "stunningly anachronistic" world of gendered roles and traditional family formation (a world this court has generally striven to put in our past) without even considering the merits of this case. That is the world represented by K.S.A. 2019 Supp. 59-2136 and *Baby Boy N.* And in Kansas, it is a world that has yet to be tested against prevailing equal protection principles.

For these reasons, I respectfully dissent.